# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| DHARMESH VINODRAI MEHTA | ) | Case No. 12-11061-BFK |
| RENU DHARMESH MEHTA | ) | Chapter 7 |
| Debtors | ) | |
| | ) | |
| SANJIV D. SHAH, *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 12-01310 |
| | ) | |
| DHARMESH VINODRAI MEHTA, *et al.* | ) | |
| | ) | |
| Defendants | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## IN SUPPORT OF ORDER DENYING DISCHARGE

This case came before the Court for a trial on the merits on March 21 and 22, 2013.  The

Plaintiffs, Sanjiv D. Shah and Kamini S. Shah, claim that the Defendants, Dharmesh Vinodrai

Mehta and Renu Dharmesh Mehta, should be denied a discharge under Section 727 of the

Bankruptcy Code.  Specifically, Mr. and Ms. Shah claim that the Mehtas: (a) transferred or

concealed assets with the intent to hinder, delay or defraud their creditors (11 U.S.C. §

727(a)(2)); (b) concealed or failed to keep books, documents or records from which the Debtors'

financial condition or business transactions might be ascertained (11 U.S.C. § 727(a)(3)); (c)

knowingly and fraudulently made false oaths or accounts in connection with this case (11 U.S.C.

§ 727(a)(4)); and (d) failed to explain satisfactorily the loss of their assets, or the deficiency of

those assets to meet their liabilities (11 U.S.C. § 727(a)(5)).  The Court will enter judgment

denying the Debtors their discharge.

**Findings of Fact**

Having heard all of the evidence, and having had the opportunity to judge the credibility of the witnesses, the Court makes the following findings of fact.

A. *The Procedural History of the Bankruptcy Case.*

1.      The Debtors, Mr. and Ms. Mehta, filed their voluntary petition in bankruptcy under Chapter 7 of the Bankruptcy Code with this Court on February 17, 2012. For a Chapter 7 case involving a married couple, the case was inordinately complex. This was because Mr. and Ms. Mehta had roughly 30 businesses with which they were involved in the years preceding their bankruptcy filing.

2.      The Debtors moved for an extension of time to file their Schedules and Statement of Affairs. Case No. 12-11061-BFK, Docket No. 14. This motion was granted by the Court. *Id.* at Docket No. 15.

3.      On March 20, 2012, the Debtors filed their Schedules and Statement of Affairs. *Id.* at Docket No. 18.

4.      On March 28, 2012, the Chapter 7 Trustee filed a Report of No Distribution. *Id.* at Docket No. 24.

5.      On April 10, 2012, the Shahs, through their counsel, filed a Motion to Extend Time to Object to the Debtors' Discharge. Docket No. 28. The Court denied the Motion on May 2, 2012, for lack of an appearance by the movants' counsel. *Id.* at Docket No. 33.

6.      On April 24, 2012, (after the Motion to Extend Time was filed, but before it was denied), the Debtors filed Amended Schedules and an Amended Statement of Financial Affairs. *Id.* at Docket No. 31. In their Amended Schedule B, the Debtors added the following language:

2

> Potential claims against Sanjiv Shah, Kamini S. Shah, DHV One, LLC, and related
> parties for improper seizure of Debtors' interests in DHV One, LLC, beyond the scope of
> the previous commitment to transfer same.

*Id.* at Docket No. 31, p. 4.

7.      In their Amended Statement of Financial Affairs, the Debtors disclosed the

following additional transfer within the two years immediately preceding the case:

> Moulin Lalaji (Transferee)      January 2011
> The Debtors relinquished their interest in Saiprasad Medical Transportation LLC to pay
> this party in exchange for a release of debt.

*Id.* at Docket No. 31, pp. 5-6.

8.      On May 11, 2012, the Shahs filed a second Motion to Extend Time to Object to

the Debtors' Discharge.  *Id*. at Docket No. 37.  At the same time, the Shahs filed a Motion for a

Rule 2004 Examination of the Debtor.  *Id.* at Docket No. 39.  The second Motion to Extend Time

was granted by the Court on May 17, 2012.  *Id*. at Docket No. 40.  The Rule 2004 Examination

Motion was granted on July 23, 2012.  *Id.* at Docket No. 53.

9.      In the meantime, on July 3, 2012, the Shahs filed a third Motion to Extend Time

to Object to the Debtors' Discharge.  *Id*. at Docket No. 48.  This Motion was rendered moot by

the fact that the Shahs filed their Complaint in this adversary proceeding on July 24, 2012.

Docket No. 1.

B.  *The ICICI Checking Accounts and the Life Insurance Policies.*

10.      On August 20, 2012, the Debtors filed a second set of Amended Schedules and a

second Amended Statement of Financial Affairs.  Case No. 12-11061-BFK, Docket No. 56.  This

time, the Debtors disclosed the following additional items of personal property on Schedule B:[1]

---

[1]    The Debtors also disclosed in their Amended Schedule J that they are paying roughly $2,900 per month for
private school for their two children.  *Compare* Case No. 12-11601-BFK, Docket No. 18, Schedule J, Line 17 ($0),
*with* Docket No. 56, Schedule J, Line 17 ($2,900).

ICICI Bank checking accts. #9484 (Rs36,067.74 Indian rupees as of 2/17/12) and #0579 (Rs17,124 Indian rupees as of 2/17/12)        $967.00

. . .

Anticipated Endowment life insurance policies, assigned to LIC of India on 8/10/10 until full repayment of loan against the policies, which loan is in default for nonpayment of principal, interest, and premiums, so no cash value.        $0.00

*Id.* at Docket No. 56, p. 1.

11.     The Defendants' Exhibits indicate that the following payments were made to the Life Insurance Company (LIC) of India policies, out of the Debtor's two ICICI bank accounts:

| Acct. No. | Date of Transfer | Amount (INR) | Exchange Rate on date of transfer[2] | Amount (USD) |
|---|---|---|---|---|
| 0579 | 5/3/2012[3] | 50,000.00 | 53.33 | $937.56 |
| 9484 | 2/17/2012 | 158,242.00 | 49.31 | $3209.13 |
| 9484 | 5/4/2012 | 80,161.00 | 53.41 | $1500.86 |
| 9484 | 5/5/2012 | 24,724.00 | 52.91 | $467.28 |

Defs.' Ex. KJ at 4, Ex. KK at 7 & 10.

C.  *The Pawned Jewelry.*

12.     In their Amended Statement of Financial Affairs, filed August 20, 2012, the Debtors listed the following additional transfer within the two years preceding the filing of the bankruptcy case:

---

[2]   The historical exchange rates on the date of transfer can be found at the Federal Reserve's web site. *Federal Exchange Rates*, Board of Governors of the Federal Reserve System, http://www.federalreserve.gov/releases/ h10/hist/dat00_in.htm (last visited June 10, 2013).  The market is closed on the weekends.  Therefore, the Court used the exchange rate for the following Monday, for transfer dates that landed on a Saturday or Sunday.

[3]   The statement actually says "03/05/2012."  However, from the preceding entry for the Value Date, "28/04/2012," it is clear that the dates are listed as "Day/Month/Year."

| May Jewelers<br>8032 Leesburg Pike<br>Tysons Corner, VA 22182 | Summer 2010 | Debtors pawned jewelry items consisting of necklaces, chains, earrings, rings, bangles, and pendants, worth  approximately $20,000, which they were unable to redeem and therefore forfeited the items. |

Case No. 12-10661, Docket No. 56, Amended Statement of Financial Affairs, ¶ 10.

13.     Ms. Mehta testified that she and her husband had forfeited approximately $20,000 worth of jewelry for a loan of $17,000, when they were unable to redeem the items at May's Jewelers.  Mr. Mehta testified to the same effect.  They both testified that no men's jewelry was ever pawned and that no jewelry was redeemed.

14.     Mr. Mehta's brother Manish Mehta testified that he went on one or two occasions to the jeweler to pay interest on the loan.  He testified that he paid $1,660 each time.  He estimated that his brother and his wife must have borrowed $82,000 to $83,000 from the jeweler, the implication being that the pawned jewelry must have had a value in excess of $82,000, and that the Debtors must have redeemed some of the jewelry.  However, Manish Mehta never actually saw the jewelry that was pawned, and did not have any direct evidence that any jewelry was redeemed.

15.     Mr. Mehta's other brother, Kirti Mehta, testified that he was involved when the jewelry was pawned.  He took Mr. Mehta to the jeweler.  He did not know whether his brother ever received any of the jewelry back.  He also testified that he personally pawned jewelry in order to help his brother, as did his wife and his children, totaling some $65,000.  He testified, consistent with the Debtors' testimony, that his brother's jewelry had a value ranging between $18,000 and $20,000.

*D.  The Debtors' Schedule J.*

*16.*     The Debtors deducted the following expenses as current monthly expenditures:

| | |
|---|---|
| Rent or home mortgage (Line 1) | $9,518.27 |
| 2nd Priority Deed of Trust Against Residence | $3,397.42 |
| 1st Priority Deed of Trust (Townhouse) | $1,553.70 |
| 2nd Priority Deed of Trust (Townhouse) | $250.00 |
| Life Insurance (Line 11(b)) | $880.00 |
| Health Insurance (Line 11(c)) | $600.00 |

Case No. 12-11061, Docket No. 56, Schedule J.

17.     Mr. and Ms. Mehta both testified that they haven't made a mortgage payment on their home (4119 Woodlark Dr., Annandale, VA 22003) since July or August 2010.  They listed the property in their original Schedule A with a value of $1,300,000, and secured debt of $2,238,501.45.  *Id.* at Docket No. 18, Schedule A.  Mr. Mehta testified that he and his wife are in negotiations with their mortgage lender and would like to retain this property.  Their Statement of Intent indicated their intention to retain this property.  *Id.* at Docket No. 18, Individual Debtor's Statement of Intent.  On April 5, 2012, the lender obtained relief from the automatic stay to conduct a foreclosure sale.  *Id.* at Docket No. 26.

18.     Mr. Mehta also testified that he and his wife have not made a mortgage payment on their rental townhome (1043 Longview Ln., Culpeper, VA 22701) since some time in 2010.  They listed this property at a value of $150,000, with secured debt in the amount of $385,905.56.  *Id.* at Docket No. 18, Schedule A.  The Debtors' Statement of Intent indicated their intention to surrender this property.  *Id.* at Docket No. 18 (Schedules), Individual Debtor's Statement of Intent.  On July 3, 2012, the secured creditor obtained relief from the automatic stay to foreclose on this property.  *Id.* at Docket No. 47.

19.     Mr. and Ms. Mehta also testified that, at the time they filed for bankruptcy, they did not have health insurance, and do not now have health insurance.  They testified that the

$600.00 per month on Schedule J for health insurance premiums was an estimate, after calling two or three insurance brokers for quotes.

20.      As for the life insurance, Mr. Mehta testified that the $880 amount on Schedule J represented payment for the two policies that were listed in the Debtor's original Schedule B (Line 9—"New York Life Insurance policy #49099xxx" and "New York Life Insurance policy #48988xxx").  *Id.* at Docket No. 18, Schedule B, Line 9.

   E.  *The Debtors' Statement in the Statement of Financial Affairs that Various Corporations and Limited Liability Companies Had "Ending Dates" That Are Not the Same as Documents Filed with the State Corporation Commission.*

21.      Section 18 of the Statement of Financial Affairs (Form 7) requests information concerning business entities for which the Debtor was an officer, director, partner or managing executive, or in which the Debtor owned five percent or more of the voting or equity securities, within the six years preceding the commencement of the case.  Section 18 further requests "the beginning and ending dates" for all such entities.

22.      The Debtor in this case listed "ending dates" for a number of business entities— Amit Services, Inc. Mini Mart III, Inc., and Amigo Services, Inc.—as "December 2010."  Pls.' Ex. 8 at 8-9.

23.      The Plaintiffs introduced evidence that, for each of these entities, Mr. Mehta had submitted forms to the Virginia State Corporation Commission dated March 23, 2011 (Mini Mart III), April 30, 2011 (Amigo Services) and March 30, 2011 (Amit Services, Inc.), in each of which Mr. Mehta listed himself as the President/Director and his wife as Vice President Director. Pls.' Exs. 21-23.

24.      The Plaintiffs further introduced evidence that the Debtor (Mr. Mehta) has engaged counsel, and has brought a lawsuit in the Circuit Court of Arlington County, in the name

of Amigo Services, Inc., against Manish Mehta and others.  The lawsuit was filed in October

2012, and seeks substantial damages (Count I: $50,000 compensatory damages and $350,000 in

punitive damages; Count II: $250,000 in damages and trebled).  Pls.' Ex. 18.

25.     Each of these businesses—Amigo Services, Inc., Mini Mart III, Inc., and Amit

Properties, LLC—was listed in the Debtors' original Schedule B, filed on March 19, 2012.  Pl.

Ex. 3, p. 2.

*F.  The Property in India.*

26.     At one time, Mr. Mehta (the Debtor) owned a partial interest in a condo unit in

India, described as 7/A Rajratan Palace II, Shanker Lane, Kandivali (West), Mumbai 400067.

Defs.' Ex. Q.  The Shahs contend that the Debtor still owned his interest in this property as of the

filing of the bankruptcy case, and that his ownership was concealed from the Debtors' creditors.

27.     The Debtor owned the property jointly with his mother and his brothers.  The

Debtor testified that in 2008 he transferred his interest in the property to his mother, in

satisfaction of a loan that she had made to him in the amount of $9,000.00.  The Debtor proffered

Defendants' Exhibit Q, which was received into evidence, and appears to document this transfer.

28.     Mr. Ramsdell, counsel for the Debtors, testified that, in his view, this transfer did

not need to be listed in the Debtor's Statement of Financial Affairs because it occurred more than

two years prior to the bankruptcy filing.

29.     Ms. Mehta testified that her husband no longer owned his interest in this property,

though she did not learn of the transfer back to her mother in law until more recently.

Specifically, she testified that she learned of the transfer shortly after she was deposed in

September 2011, where she testified that the unit was "owned by my mother in law and my

husband."

8

30.     The Debtor's father, Mr. Vinodrai Mehta, testified that he was familiar with Exhibit Q, that he signed it and sent it back to the attorney who prepared it, in 2008.

31.     The Debtor's mother, Mrs. Minaxi Mehta, also testified that she had loaned her son money, and that Exhibit Q represented the transfer of his interest in the unit back to her in satisfaction of the debt.  She testified that, before 2008, her husband was not on the deed to the unit.  However, after the 2008 transfer represented by Exhibit Q, both she and her husband shared the title to the unit with their two sons, Manish and Kirti Mehta.

32.     Kirti Mehta testified that he was aware of the 2008 agreement (Exhibit Q) and that he had discussed it with his father at the time.

33.     Manish Mehta's testimony clashed sharply with that of his brothers and his parents.  He testified that he had never seen Exhibit Q, and that he was unaware of the transfer of his brother's interest in the property in 2008.  He testified that he would have known of the transfer because it was family property.  It is also possible, however, that he might not have known of the transfer, particularly since he is estranged from his parents; his father testified that he and Manish have "no relationship" and they haven't spoken in 3.5 years.

*G. The Saiprasad Transaction.*

34.     The Saiprasad transaction is easily the most confusing part of this case.  Saiprasad is a medical transport business, formerly owned by the Debtors.  Mr. Mehta (the Debtor) testified that he transferred the business to Moulin Lalaji in 2011, in satisfaction of $21,000 that Mr. Mehta owed to Mr. Lalaji.  This was supported by a document dated January 28, 2011, entitled "Agreement and Release," between Mr. and Mrs. Mehta and Mr. Lalaji.  Pls.' Ex. 25 (hereinafter the "Agreement and Release").

35.    Mr. Mehta (the Debtor) testified that the business had a negative value, at the time

he and his wife transferred ownership to Mr. Lalaji.[4]  He testified that the $21,000 was in the

form of three checks of $7,000 each, which were deposits on vehicles owned by Saiprasad.  Pls.'

Ex. 25 at 2-3.  He further testified that he did not deposit these checks.  Rather, he cashed them at

a check cashing store and used the funds to pay his wife's debts.

36.    Mr. Lalaji testified at first that the source of the $21,000 "was my personal

funds," but then acknowledged that the money came from his father.  He testified that he did not

deliver the checks personally to Mr. Mehta; rather, someone delivered them to Mr. Mehta on

behalf of Mr. Lalaji's father.

37.    This version of a January 2011 transfer of the business was undercut by an

Interest Purchase Agreement, dated as of April 12, 2011.  Pls.' Ex. 26 (hereinafter the "Interest

Purchase Agreement").  The Interest Purchase Agreement lists Mr. Lalaji as "Buyer 1" and

Minaxi Vinodrai Mehta (the Debtor's mother) as "Buyer 2."  *Id.*  It further lists Mr. and Mrs.

Mehta (the Debtors) as "Seller 1" and "Seller 2," respectively.  *Id.*  It recites that Mr. Lalaji was

buying a 53% membership interest in the company, and Minaxi Mehta was buying a 47%

membership interest in the company.  *Id*.  The Purchase Price is listed as $44,000.  *Id*. at ¶ 2.2.

38.    Mr. Lalaji's testimony largely supported the Debtor's version of events, that the

Debtors transferred their interest in Saiprasad to him in January 2011.  He confirmed that he was

owed $21,000 at the time.  Oddly, though, Mr. Lalaji testified that the "release" provision of the

Agreement and Release (Pls.' Ex. 25) meant that the Mehtas were "releasing" their interests in

Saiprasad to him, i.e., that they were transferring their ownership interests to him.  He was

adamant in his testimony, however, that he had not released the $21,000 in indebtedness owed to

---

[4]   This is borne out, to a degree, by the Debtors' K-1's for 2011, which indicate a loss of $22,506.  Defs.' Ex. OA.

him by the Mehtas in exchange for the transfer of Saiprasad.  He testified that, as far as he was

concerned, they still owed him $21,000.[5]

39.     Mr. Lalaji testified that the Membership Interest Purchase Agreement (Pls.' Ex.

26) was requested by his father.  His father wanted to add Mrs. Mehta (the Debtor's mother) to

the ownership of Saiprasad because the families were close, and the senior Mr. Lalaji felt badly

for Mrs. Mehta.  However, Mr. Lalaji testified that a closing never took place and that the

Interest Purchase Agreement was never carried out.  This, he testified, was because Mrs. Mehta

(the Debtor's mother) rejected the idea of becoming an owner of Saiprasad.

40.     As evidence of the Debtor's alleged continued ownership interest in Saiprasad,

the Plaintiffs introduced into evidence three Virginia Motor Vehicle Registrations for three

vehicles owned by Corporate Fleet Leasing and leased by Saiprasad.  Pls.' Ex. 20.  One of these

Registrations pre-dated the alleged January 2011 transaction, as it was issued on July 1, 2010.

*Id.* at 1.  Two of them were dated May 17, 2012.  *Id.* at 2-3.  All three used the Mehtas' home

address for Saiprasad.  *Id.*  Mr. Mehta testified that he had just never changed the address with

the DMV, and that he sent them to Mr. Lalaji as soon as he received them.

41.     Mr. Mehta (the Debtor) supported Mr. Lalaji's version of the Interest Purchase

Agreement.  He testified that there was "no significance" to it, that his mother found out about it

and that it was "never used."

  *H.  The Alleged Failure to Keep Books and Records and the Alleged Failure to Explain
       the Loss of Assets.*

42.     Ms. Mehta (the Debtor) testified that she is self-employed.  She is a consultant for

small businesses, with respect to their payroll, managing employees and other management

---

[5]   If Mr. Lalaji's version of events is to be believed, then this appears to have been a transfer of the Debtors'
interests in Saiprasad without valuable consideration.

functions. She testified that she is usually paid in cash. She testified that she did not receive any 1099's for 2011, nor for 2012. She charges by the project, not on an hourly basis.

43.     Ms. Mehta also testified that she does not have a bank account. She has not had a bank account in two years.

44.     Sometimes, Ms. Mehta sells items at cultural fairs, but she testified that, when she factored in the costs of the items, transportation, etc., she had a loss on the sales.

45.     Ms. Mehta testified that she made $3,500 in 2012, as of the filing of the bankruptcy case (calculated as of the end of the month). She testified that in 2011, she had $24,750 in consulting income. She also testified that in 2011, her husband had $70,200 in income. She testified that she did not do any consulting work for CPR Medical Transport which she described as her brother in law's and his wife's company.

46.     Mr. Mehta (the Debtor) testified that he is a business consultant, in the retail business and in real estate, though he is not a licensed real estate broker. He testified that in 2011, he made $68,000 in consulting fees from CPR Medical Tansport, and maybe another $2,200 from other sources. He also described CPR Medical Transport as his brother's and his brother's wife's company. He testified that he did receive a 1099 from CPR for 2011 and for 2012 (though, he was unable to produce copies).

47.     Mr. Mehta testified that the last time he and his wife had an active bank account was in 2010.

   *I.   The Failure to Answer Statement of Financial Affairs Questions 19 – 25.*

48.     When Mr. and Mrs. Mehta filed for bankruptcy, they filled out the Schedules and Statement of Affairs at Mr. Ramsdell's office. The Official Form (B-7) for the Statement of Financial Affairs has 25 questions. In this case, the Mehtas submitted a Statement of Financial

Affairs that included only Questions 1 through 18.  Mr. Ramsdell testified that, when debtors fill

out the Statement of Financial Affairs and there is no relevant information to be included in

Questions 19 through 25, the software simply deletes Questions 19 through 25.

49.     Questions 20 through 25 clearly relate to corporations and partnerships, and are

not relevant to an individual case.  Question 19 does call for the identity of persons who have

kept books and records of the debtor, have prepared financial statements for the debtor, or the

identity of financial institutions to which a financial statement was given.  Thus, Question 19 can

be relevant in an individual case, if for example, the debtor used a bookkeeper or an accountant

to prepare his or her tax returns, or if the debtor had submitted a financial statement to a bank

within the two years preceding the case.

### Conclusions of Law

The Court has jurisdiction over this matter pursuant to 11 U.S.C. § 1334(b) and the Order

of Reference of the U.S. District Court for the Eastern District of Virginia dated August 15,

1984.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(J) (objections to discharges).

The standard of proof is by a preponderance of the evidence.  *Farouki v. Emirates Bank

Intern., Ltd.,* 14 F.3d 244, 249 (4th Cir. 1994).  "Although the burden may shift to the debtor to

provide satisfactory, explanatory evidence once the creditor has established a *prima facie* case,

the ultimate burden rests with the creditor."  *Id*.  A party objecting to discharge needs to prove

only one of the grounds for non-dischargeability under Section 727(a) because the provisions of

Section 727(a) are phrased in the disjunctive.  *Id*. at 250.

The primary purpose of bankruptcy law is to give honest debtors a fresh start.  *Farouki*,

14 F.3d at 249.  However, Section 727 can result in a denial of discharge, where debtors "play

fast and loose with their assets or with the reality of their affairs." *Id.* The Court will address each of the Plaintiffs' allegations, in turn.

### I. Section 727(a)(2) (Transfer or Concealment of Property of the Estate Within One Year of the Date of the Petition).

Section 727(a)(2) of the Bankruptcy Code provides that the Court shall grant the debtor a discharge, unless:

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
> (A) property of the debtor, within one year before the date of the filing of the petition; or
> (B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2).

Section 727(a)(2) "serves to deny a discharge when the debtor 'attempts to prevent the collection of his debts by concealing or disposing of assets." *In re Sieber*, 489 B.R. 531, 545 (Bankr. D. Md. 2013) (quoting *Wachovia Bank v. Voccia (In re Voccia)*, 477 B.R. 625, 632 (Bankr. E.D. Va. 2011). Here, there are five alleged transfers or concealments of property: (a) the Debtors' interest in Saiprasad; (b) the pawned jewelry; (c) the property in India; (d) the ICICI accounts; and (f) the Life Insurance policies. The Court will address each alleged concealment or transfer.

#### A. The Debtor's Interest in Saiprasad.

The Agreement and Release was outside of the one year limit under Section 727(a)(2)(A) of the Bankruptcy Code. The Debtors filed their bankruptcy case on February 17, 2012. The Agreement and Release was dated January 28, 2011. Further, the Debtor's testimony, to the effect that he parted with any interest in Saiprasad as of January 28, 2011, in satisfaction of the

debt to Mr. Lalaji, was largely supported by Mr. Lalaji's testimony (though, Mr. Lalaji had a different understanding of the "release" provision of the Agreement and Release).

The Interest Purchase Agreement confuses matters greatly.  Under this Agreement, it would appear the Debtor's mother was granted a 47% interest in the company.  Both the Debtor and Mr. Lalaji testified that this Agreement was meaningless; in essence, it was prepared at the request of Mr. Lalaji's father, but never carried through.  Although the circumstances of this Agreement, some four months after the Debtor supposedly parted with his interest in the company, certainly raise questions of veracity, the Court cannot conclude that the Debtor retained an interest in Saiprasad.  No evidence was submitted, for example, that Saiprasad transferred any funds to the Debtor after January 2011, whether in the form of salary, consulting income or distributions of profit.  The fact that the DMV registration forms for the Saiprasad vehicles were mailed to the Debtors' home address was simply a failure to supply the DMV with the changed address for these vehicles after January 2011.

The Court finds that the Debtor transferred his interest in Saiprasad to Mr. Lalaji in January 2011, and did not retain an ownership interest in Saiprasad thereafter.  The Court will not deny the Debtor a discharge based on the allegation that he retained an interest in Saiprasad.[6]

B. *The Pawned Jewelry.*

The Debtors pawned their jewelry, as well as jewelry of their family members, in the Summer of 2010.  The Plaintiffs allege that, as of the filing of the bankruptcy case, the Debtors retained an interest in this property.  More specifically, the Plaintiffs allege that the Debtors had redeemed certain pieces of jewelry and still owned those pieces, or that they still had items of jewelry pawned with May Jewelers that had not been redeemed as of the filing of the bankruptcy

---

[6]  Ms. Mehta appears never to have had an interest in Saiprasad.  Even if the Court found against Mr. Mehta on this issue, this would not constitute grounds to deny Ms. Mehta a discharge.

case.[7]  Here, the Plaintiffs' evidence falls short.  There was no evidence presented that the

Debtors actually redeemed their jewelry, or that they still had jewelry on pawn with May

Jewelers at the time they filed their bankruptcy case.  Both Debtors' testimony was consistent

with that of their brother, Kirti Mehta, that no jewelry had ever been redeemed.  Manish Mehta's

testimony, to the effect that there must have been more jewelry because he paid $1,660 each time

he went to the jewelers (thereby creating an inference that there was really more like $80,000 in

jewelry, not $18,000 to $20,000) is unsupported.  Further, it is possible that Manish Mehta paid

(perhaps unknowingly) interest on the entire family's pawned jewelry, not just Mr. and Ms.

Mehta's pawned jewelry.  Kirti Mehta testified that his family had pawned an additional $65,000

in jewelry, in order to help his brother.  It is possible that Manish Mehta's estimate of the amount

of the jewelry includes Kirti Mehta's family's jewelry as well.

The Court finds that the evidence on the pawned jewelry is insufficient to deny the

Debtors a discharge under Section 727(a)(2) of the Code.

*C.  The Property in India.*

The Court finds that the Debtor parted with title to the property in India in 2008.  This

transfer did not need to be listed in the Debtor's Schedules or Statement of Affairs.  The

documentary evidence of the transfer was quite thin, existing of Exhibit Q alone.  However, the

Debtor's testimony that he parted with title in 2008, in satisfaction of a debt to his mother, was

corroborated by his mother and his father.

The Debtor's wife, Ms. Mehta testified that she did not know of the transfer until 2011,

when she was deposed in the State court action.  The Court does not accept Manish Mehta's

testimony that, because he is a family member, he necessarily would have known of the transfer

---

[7]   The alleged failure to list the forfeiture of the jewelry in their Statement of Financial Affairs is addressed in Part
III(B), below.

of the property in 2008.  At times, family members do not learn of transfers of their parents' or siblings' property until after the fact.  This appears to be the case here.

The Court accepts the testimony of the Debtor's mother and father, that the property had been transferred back to the mother in 2008.  The Court will not deny the Debtors a discharge based on the alleged concealment of this property under Section 727(a)(2) of the Bankruptcy Code.[8]

   *D.  The ICICI Accounts and the Anticipated Endowment Life Insurance Policies.*

Unquestionably, the Debtors' interests in the two ICICI bank accounts ($967) and the Debtors' two Life Insurance Company of India ("LIC of India") life insurance policies were not listed in their original Schedule B.  Case No. 12-11061, Docket No. 18, Schedule B.  These were the subject of the Amended Schedule B filed on August 20, 2012.  *Id.* at Docket No. 56.  Mr. Ramsdell, the Debtors' bankruptcy counsel, testified that the ICICI bank accounts only came to his attention later in the case.  The Court accepts his testimony.  Given the complexity of the Debtors' financial situation, the initial failure to list the two ICICI checking accounts, with a total of $967 as of the filing date, might not in and of itself be of such a material nature that the Debtors would be denied their discharge.  However, the failure to list these two bank accounts has to be viewed in conjunction with the failure to list the two LIC of India policies.  Had the Debtor listed the two ICICI bank accounts, this would have caused the Chapter 7 Trustee to investigate the two LIC of India policies, because the Debtors were paying for the two LIC of India policies out of the ICICI bank accounts.  Indeed, the Debtors paid one premium for one of the policies on the day that they filed for bankruptcy, February 17, 2012.  They paid two more

---

[8]  The Court also notes that Ms. Mehta (the Debtor) never had any ownership interest in this property, and was unaware of the status of title to this property. Even had the Court found against Mr. Mehta on this issue, Ms. Mehta could not be denied a discharge for the alleged concealment of this property.

premiums three weeks later, on March 4 and 5, 2012, after they had filed for bankruptcy and before they attended their first meeting of creditors on March 26, 2012.

The Debtors filed their Amended Schedules listing the ICICI bank accounts on August 20, 2012, almost a month after the Plaintiffs had filed their Adversary Complaint on July 24, 2012.  Docket No. 54.  The Adversary Complaint alleges that "upon information and belief, Dharmesh and/or Debtors had multiple accounts with ICICI Bank within the last two years."  Docket No. 1, Complaint, ¶ 39.  It was not until after the filing of the Complaint that the Debtors chose to disclose the existence of the ICICI bank accounts in their Amended Schedules.

In response, the Debtors suggest that the LIC India policies had no value whatsoever.  This may be true, but it is the Debtors' obligation to list all of their property, so that the Chapter 7 Trustee can make his or her own investigation of the value of any property listed.  Clearly, the Debtors believed that the LIC policies had some value to them—they paid the premiums after they filed for bankruptcy.  If the policies had no value, the Court cannot understand why the Debtors would continue to pay on them after the Debtors filed their bankruptcy case.  The Debtors could have walked away from LIC of India with no consequence (at least in the United States).

The Court concludes that the Debtors consciously chose to avoid listing, which is to say, concealed, the ICICI bank accounts and the two LIC India policies, with the intent to hinder, delay or defraud their creditors.  The Court will deny the Debtors their discharge under Section 727(a)(2)(B) of the Bankruptcy Code for concealing the ICICI bank accounts and the two LIC of India policies in their Schedules.

## II.  Section 727(a)(3) (Concealment, Destruction or Failure to Keep Books and Records, Unless Such Failure is Justified Under the Circumstances of the Case).

Section 727(a)(3) of the Code requires the Court to deny a Debtor his or her discharge where:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3).

The purpose of Section 727(a)(3) is "'to give creditors sufficient information from which they can assess the debtor's estate and general financial posture.'"  *In re Sieber*, 489 B.R. at 550 (quoting *Union Bank of the Middle East, Ltd. v. Farouki (In re Farouki),* 133 B.R. 769, 780–81 (Bankr. E.D. Va. 1991)).  "'The records produced by a debtor are adequate if they reflect the debtor's finances with a fair degree of accuracy and in a manner appropriate to the debtor's business.'"  *Id.*

Ms. Mehta testified that she did not receive any 1099's for 2011 or 2012 and that she was always paid in cash for her consulting services.  Ms. Mehta testified that her husband had approximately $70,200 in consulting income for 2011.  Mr. Mehta testified that he did receive 1099's from CPR Medical Transport, for 2011 and 2012, but he was unable to produce copies. Both Debtors testified that they have not maintained any bank accounts since 2010.  Ms. Mehta sold some items at cultural fairs, but did not have any records relating to these sales, contending that everything was sold at a net loss, after taking into account the cost of the goods, transportation and other costs of the sales.

It is apparent that, in order to render themselves judgment proof (or at least to frustrate collection of the Shahs' claim), the Debtors have chosen to live a cash-only lifestyle.  This, in

turn, resulted in a record-free history from 2010 to date.  Were the Debtors destitute, living in temporary housing, or other financially constrained circumstances, with a relentless creditor on their heels, the Court might understand.  But, in this case, the Debtors are still living in their Annandale home, accruing (but not paying) mortgage payments at the rate of $9,518.27 per month on their first mortgage, and accruing (but not paying) $3,397.42 per month on their second mortgage.  Case No. 12-11061, Docket No. 18, Schedule J.  The Court will assume that a property that has (or had at one time) $12,915 in monthly mortgage payments is a substantial property.  The Debtors listed the value of this property at $1,300,000 in their original Schedules A and C.  There are considerable utility payments and maintenance expenses associated with the home—$1,050 per month, according to the Debtors' Schedule J—but, how these expenses are being paid on a monthly basis is a mystery to the Court.

Further, the Debtors consistently have been paying approximately $3,000 per month in cash for their children to attend a private school, both pre-petition and after they filed for a Chapter 7 liquidation of their assets.  Pls.' Ex. 27; Defs.' Ex. KR.  One payment of $3,131 in cash was made on January 17, 2012, a month before the Debtors filed for bankruptcy.  Another payment, in the amount of $3,131, also in cash, was paid on February 27, 2012, ten days after the Debtors filed for bankruptcy.  The source of these cash payments also is unknown to the Court.

The Debtors had $9,800 in rental income from the Culpeper property for the first eight months of 2012.  Pls.' Ex. 28.  They had $25,659.68 in rental income from the same property during 2011.  Pls.' Ex. 28 at 2 (2011 Form 1099).  Yet, because they chose not to maintain a bank account, there are no records indicating the disposition of these funds.  What became of these funds also is entirely unknown to the Court.

Section 727(a)(3) provides an out for honest debtors "unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3). The Court finds that the opposite is true. The failure to maintain any books or records from which the Debtors' financial condition might be ascertained was not inadvertent. The Debtors both are highly intelligent and financially sophisticated people. Their decision not to maintain any bank accounts, and not to retain any books and records from which their financial affairs might be ascertained, was a conscious one, without any justification whatsoever.

The Court will deny the Debtors their discharge based on their failure to keep and maintain books and records from which their financial condition might be ascertained. 11 U.S.C. § 727(a)(3).

### III.   Section 727(a)(5) (Failure to Explain Satisfactorily any Loss of Assets or Deficiency in Assets to Meet the Debtor's Liabilities).

Section 727(a)(5) of the Bankruptcy Code serves a closely related purpose to that of Section 727(a)(3). Under Section 727(a)(5), a Debtor may be denied a discharge where "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5).

Under Section 727(a)(5), the objecting party must establish that "'the debtor at one time owned a substantial identifiable asset, not too remote in time to the date of the commencement of the case; [and] that on the date of filing the voluntary petition the debtor no longer had the particular asset.'" *In re Ferebee*, 2012 WL 506740 at *8 (Bankr. E.D. Va. 2012) (quoting *Menotte v. Hahn (In re Hahn),* 362 B.R. 542, 548 (Bankr. S.D. Fla. 2007)). Further, in order to constitute a "satisfactory" explanation, the Debtor's version of events "must not consist of vague

21

and indefinite explanations." *Id*. (citing *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619

(11th Cir. 1984)).

Here, as noted above, the Debtors had rental income from the Culpeper property in 2011

and 2012.  What became of those funds is not known to the Court.  Both of the Debtors testified

that they had not made a mortgage payment on this property since some time in 2010.  A

sizeable amount of money, therefore, is unaccounted for.  This is not remote from the filing of

the case, and it is not insubstantial.  The Debtors made no attempt to explain the loss of these

funds at trial.  The Court will deny the Debtors their discharge based on their failure to explain

satisfactorily the loss of the rental income on the Culpeper property under Section 727(a)(5) of

the Bankruptcy Code.

### IV.   Section 727(a)(4) (Knowingly and Fraudulently Making a False Oath or Account).

Section 727(a)(4) of the Code provides, in relevant part, that the Court shall grant the

debtor a discharge, unless "the debtor knowingly and fraudulently, in or in connection with the

case—(A) made a false oath or account."  11 U.S.C. § 727(a)(4).

In order to prevail under Section 727(a)(4), the Plaintiff must prove that "the debtor had

the intent to defraud either through direct evidence or by pointing to specific facts and

circumstances that, in the aggregate, demonstrate a pattern of reckless disregard for the truth

sufficient to warrant an inference of fraudulent intent." *Webb v. Isaacson (In re Isaacson)*, 478

B.R. 763, 784 (Bankr. E.D. Va. 2012).  Additionally, the false oath or account "must be material

in that 'it adversely affects the ability of the trustee or creditors to fully discover the debtor's

assets and financial condition.'" *Id*. (quoting *Jalajel v. Pugsley*, No. 1:11cv163, 2011 WL

1348312, at *2 (E.D. Va. Apr. 8, 2011)).

In this case, the Plaintiffs allege six examples of false oaths or accounts: (a) mortgage and insurance expenses claimed on the Debtors' Schedules I and J; (b) the alleged concealment of an interest in the pawned jewelry; (c) the alleged concealment of the Debtors' interest in Saiprasad; (d) the failure to list the ICICI accounts and the life insurance policies; (e) the use of allegedly false "ending dates" for the Debtors' various business enterprises in the Statement of Financial Affairs; and (f) the failure to list the property in India.

A.  *The Debtors' Schedules I and J.*

The allegations relating to Schedules I and J can be broken down into two separate categories: (a) the Debtors' inclusion of their mortgage payments on their principal residence and on the Culpeper property on Schedule J; and (b) the Debtors' deductions on Schedule J for health insurance premiums that they did not have at the time.

1.  *The Debtors' Mortgage Payments.*

In their Schedule J Statement of Expenses, the Debtors listed $9,518.27 for their monthly mortgage payment on 4119 Woodlark Dr. Annandale, VA 22003, as well as $3,397.42 on a second mortgage.  In their Statement of Intention, the Debtors stated their intent to retain this property, notwithstanding the fact that they had not paid the mortgage since some time in 2010.

The Debtors also listed on their Schedule J $1,553.70 for the first mortgage on their rental property located at 1043 Longview Lane, Culpeper, VA 22701, as well as a second mortgage of $250, and HOA dues of $100.  The Debtors stated that they would surrender this property, in their Statement of Intent.  The secured creditor filed a Motion for Relief from the automatic stay on June 7, 2012 (Docket No. 43), and was granted relief from the stay with respect to this property on July 3, 2012 (Docket No. 47).  True to their Statement of Intention, the Debtors did not oppose the secured lender's relief from stay motion.  It appears that the

Debtors were simply trying to hang on to this property for as long as possible in order to keep the rental income ($2,225 per month according to their Schedule I Statement of Income), before the secured lender foreclosed on the property.

Here, the Plaintiffs rely on Judge Mitchell's opinion in the case of *In re Crawley*, 412 B.R. 777 (Bankr. E.D. Va. 2009), for the proposition that it constitutes bad faith for the Debtors to list their monthly mortgage payments for two properties on which they were hopelessly behind in the mortgage payments. In *Crawley*, Judge Mitchell first held that for purposes of determining whether the petition was filed as an abuse under Section 707(b)(2) of the Bankruptcy Code, "the debtors, in performing their means test calculations, are entitled to deduct the average of the payments that would be contractually due, as of the filing date of the petition, for the subsequent 60 months on the four  mortgages, notwithstanding their stated intent to surrender both houses." *Id*. at 784. In support of this conclusion, the court cited, among other cases, *In re Quigley*, 391 B.R. 294 (Bankr. N.D. W.Va. 2008). The *Quigley* case was later reversed by the Fourth Circuit. *In re Quigley*, 673 F.3d 269 (4th Cir. 2012). In *Quigley*, the Fourth Circuit held that the Supreme Court's ruling in *Hamilton v. Lanning*, ___ U.S. ___, 130 S. Ct. 2464 (2010), precluded the debtor from deducting secured debt payments on collateral that the Debtor intended to surrender.

Still, Judge Mitchell went on to analyze the case under Section 707(b)(3), the "totality of the circumstances" test, and ultimately held that the debtors' case was an abuse. In part, Judge Mitchell based his ruling on the fact that the debtors "had not made mortgage payments in more than two months at the time they filed their petition, and had walked away from the two properties with no intention of returning or resuming payments." 391 B.R. at 789.

The Court believes that, in this case, it is appropriate to look at the two properties separately.  First, with respect to the Annandale property, the Debtors have stated their intent to retain that property.  They still reside there and have not abandoned the property.  It is true that they had not made a mortgage payment for quite some time.  It is still theoretically possible, though, that the Debtors can achieve a mortgage loan modification, in which the principal balance is written down, the accrued interest deferred, the interest rate reduced, or a combination of any of the foregoing.  The Court cannot say that, where the Debtors have stated their intent to retain the property, and are living there today, that the listing of the mortgage payment on Schedule J is a knowing and fraudulent false oath or account, even where the mortgage has remained unpaid for some lengthy period of time.

The rental townhome in Culpeper is a different story, but with the same result.  Here, the Debtors listed the property in Schedule A.  They stated that their intent was to surrender the property.  They listed the two mortgage payments and the HOA dues in their Schedule J.  The Court cannot determine what purpose was served by this.  At the end of the day, it almost certainly would not have made any difference in terms of determining whether the case was an abuse under Section 707(b) of the Code (commonly known as the means test), given the Debtors' other debts (they listed a total of $13,760,620.90 on their Schedule F).

At least one bankruptcy court has held: "only in the context of a chapter 13 proceeding is the concept of PDI [projected disposable income] relevant."  *In re Grinkmeyer*, 456 B.R. 385, 388 (Bankr. S.D. Ind. 2011).  In this Court's view, in a Chapter 7 case, the debtors' projected

monthly income, as reflected in their Schedules I and J, should not by itself be determinative of

whether the Debtors are entitled to a discharge under Section 727 of the Code.[9]

The Court also notes that the Fourth Circuit's opinion in *In re Quigley* was decided on

March 7, 2012, about three weeks after these Debtors filed their bankruptcy petition.  It is

probable that the Debtors, with the advice of counsel, would not list the monthly mortgage

payments on property that they intend to surrender, in a post-*Quigley* environment.  However,

the Court will not fault them, and will not deny them their discharge, based on the deductions on

Schedule J for the first and second mortgages on the townhome in Culpeper which were taken

before *Quigley* was decided.

The Court finds that listing the mortgage payments on the Annandale residence and on

the Culpeper property did not constitute false oaths or accounts.

*2.   The Debtors' Deductions for Life Insurance and Health Insurance.*

In their Schedule J, the Debtors listed $600 in monthly health insurance premiums, and

$880 in life insurance premiums.  The Debtor, Mr. Mehta, testified that the $880 was for the two

life insurance policies with New York Life, originally listed in their Schedule B.  (This amount

was *not* for the LIC of India policies, which the Court has already found that the Debtors

intended to conceal from their creditors.)  The listing of the $880 was not a false oath or account.

The $600 in monthly health insurance premiums is another story altogether.  This

amount, to put it simply, was a fabrication.  The Debtors did not have health insurance at the

time that they filed for bankruptcy.  They both testified that they called an insurance broker, and

obtained a quote for a health insurance policy for a family of their size.  This was an intentional,

knowing, false oath or account.  The Court does not understand what motivated this false oath; in

---

[9]  It also is not clear that the Debtors are debtors with primarily consumer debts.  From a review of their Schedules,
they appear to be debtors with primarily business debts.

the end, it probably would not have made a difference in the form of bankruptcy relief available

to the Debtors.  It was, however, demonstrably false, and the Debtors' involvement in this

falsehood was knowing.  This is a false oath or account for which the Debtors will be denied

their discharge under Section 727(a)(4)(A) of the Bankruptcy Code.

     *B.  The Alleged Concealment of an Interest in the Pawned Jewelry.*

As the Court found above, the Plaintiffs have failed to meet their burden that there was

any remaining jewelry at the time that the Debtors filed their bankruptcy case.  The failure to list

any jewelry does not constitute grounds for a denial of discharge under Section 727(a)(4)(A) of

the Bankruptcy Code.

     *C.  The Alleged Concealment of the Debtors' Interest in Saiprasad.*

Although the circumstances of the Saiprasad transaction are suspicious, the Court finds

that the Debtors have adequately explained this transaction.  The Court finds that the Debtors'

failure to list an interest in Saiprasad as of the date of the filing of their petition was not a false

oath or account under Section 727(a)(4)(A) of the Bankruptcy Code.

     *D.  The Failure to List the ICICI Accounts and the Life Insurance Policies.*

For the reasons stated in Part I.D. above, the Court will deny the Debtors their discharge

based on their failure to list the ICICI bank accounts and the two LIC of India life insurance

policies.  As noted, it was not until after the Plaintiffs' Complaint was filed in this adversary

proceeding, putting directly in issue the ICICI bank accounts (Complaint, ¶ 39), that the Debtors

chose to amend their Schedules to disclose the existence of these two bank accounts.  It was

obvious to the Defendants, once they listed the ICICI bank accounts, that the existence of the

LIC of India insurance policies would be disclosed, because the ICICI bank accounts list LIC of

India as a payee (pre-petition and post-petition).  Hence, the Debtors were compelled to disclose

27

the LIC of India insurance policies as well.  The Court finds that the failure to list the ICICI

accounts and the LIC of India life insurance policies in Schedule B (Docket No. 18) constitutes a

knowing and fraudulent false oath for which the Debtors will be denied their discharge under

Section 727(a)(4)(A) of the Bankruptcy Code.

     *E.  The use of Allegedly False "Ending Dates" for the Debtors' Various Business*
        *Enterprises in the Statement of Financial Affairs.*

In their Statement of Financial Affairs, the Debtors listed "ending dates" for a number of

business entities—Amit Services, Inc., Mini Mart III, Inc., and Amigo Services, Inc., as

"December 2010."  Pls.' Ex. 8 at 8-9.  The Plaintiffs assert that these businesses had a continuing

life, pointing to the fact that Mr. Mehta had submitted forms to the Virginia State Corporation

Commission dated March 23, 2011 (Mini Mart III), April 30, 2011 (Amigo Services) and March

30, 2011 (Amit Services), in each of which Mr. Mehta listed himself as the President/Director

and his wife as Vice President Director.  Pl. Exs. 21-23.

It is not entirely clear what the phrase "ending date" means in Form B-7.  The Court

understands it to mean when the entity last actively conducted any business.  There was no

evidence presented that any of these entities had actively conducted any business after December

2010.  The only evidence was that Amigo Services had brought a lawsuit in Arlington County

against the Debtor's brother, Manish Mehta, and others.  However, the filing of a lawsuit is not

actively conducting business, and it appears that Amigo Services is nothing more than a shell, an

entity through which any litigation claims can be brought.

The Court finds that the Plaintiffs have failed to sustain their burden of proof with respect

to the use of December 2010 as an ending date for these business entities in the Debtors'

Statement of Financial Affairs, as an alleged false oath or account.

F.   *The Failure to Answer Statement of Financial Affairs Questions 19-25.*

The Plaintiffs allege that the Debtors' failure to answer Questions 19 through 25 on their

Statement of Financial Affairs is tantamount to a false oath or account.  As found above,

Questions 20 – 25 relate to limited liability companies, partnerships and corporations, and do not

apply to individuals.  Question 19, calling for the identity of persons who maintained books and

records arguably is relevant in an individual case.  In this case, however, there was no evidence

that the Debtors had a bookkeeper or an accountant whose identity they were trying to conceal

from their creditors.  The Court finds that, in this case, the failure to answer SOFA Questions 19

through 25 was not a material omission.  The Court will not deny the Debtors a discharge based

on their failure to answer Questions 19 through 25.

G.   *The Failure to List the Property in India.*

Finally, the Plaintiffs allege that the Debtors failed to list Mr. Mehta's continuing interest

in the property in India.  However, the Court finds that the Debtor, Mr. Mehta, parted with his

interest in 2008.  Although the evidence was not entirely clear, Exhibit Q corroborates the

Debtors' testimony that Mr. Mehta (the Debtor) parted with title to this property in 2008.  Mr.

Mehta's testimony was confirmed by his mother and his father, who are co-owners in the

property.  The only witness who disputed the 2008 transfer was the Debtor's brother, Manish

Mehta, who testified that, had his brother parted with title to the property, he would have known

it because it was family property.  It is equally plausible, however, that Mr. Mehta (the Debtor)

did transfer his interest in this property to his mother in 2008 in satisfaction of loans that she had

made to him, and Manish Mehta might not have known about it.  Families have a certain

dynamic to them, and it is entirely possible that one sibling might not have the same information

or understanding concerning family property that other siblings might possess.

The Court finds that the Plaintiffs have not sustained their burden of proof to show that the Debtor had an unlisted interest in the property in India.

## Conclusion

In sum, the Court will deny the Debtors a discharge based on: (a) the concealment of the ICICI bank accounts (11 U.S.C. § 727(a)(2)(B)); (b) the concealment of the LIC of India life insurance policies (11 U.S.C. § 727(a)(2)(B)); (c) the false oath in the failure to list the ICICI bank accounts in the Debtors' Schedules (11 U.S.C. § 727(a)(4)); (d) the false oath in the failure to list the LIC of India life insurance policies in the Debtors' Schedules (11 U.S.C. § 727(a)(4)); (e) the false oath or account in fabricating a cost item of $600 in monthly health insurance premiums on the Debtors' Schedule J (11 U.S.C. § 727(a)(4)); (f) the Debtors' failure to keep or maintain any books and records from which their financial condition or business transactions might be ascertained, without justification (11 U.S.C. § 727(a)(3)); and (g) the Debtors' failure to explain satisfactorily the loss of the rental proceeds from the Culpeper property (11 U.S.C. § 727(a)(5)).

A separate Order denying the Debtors their discharge shall issue.

Date: _Jun 25 2013_____          /s/ Brian F. Kenney
                                     _____

                                     Brian F. Kenney
Alexandria, Virginia                 United States Bankruptcy Judge

                                      eod 6/25/2013

Copies to:

Sanjiv D. Shah
Kamini S. Shah
c/o Busman & Busman, P.C.
P.O. Box 7514
Fairfax Station, VA 22039
Plaintiffs

Kevin S. Jaros, Esquire
Busman & Busman, P.C.
P.O. Box 7514
Fairfax Station, VA 22039
Counsel to Plaintiffs

Dharmesh Vinodrai Mehta
Renu Dharmesh Mehta
4119 Woodlark Dr.
Annandale, VA 22003-2343
Defendants

Christopher S. Moffitt, Esquire
218 North Lee Street
3rd Floor
Alexandria, VA 22314
Counsel to the Defendants